## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC.; SOCIAL LIFE NETWORK, INC.; and REDHAWK HOLDINGS CORP., individually and on behalf of all others similarly situated, | Index No.:_____ |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| -against- | |
| CROWN BRIDGE PARTNERS, LLC, SOHEIL AHDOOT, and SEPAS AHDOOT, | |
| *Defendants.* | |

Plaintiffs DarkPulse, Inc. ("DarkPulse"), Social Life Network, Inc. ("Social Life"), RedHawk Holdings Corp. ("RedHawk") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, as for their Complaint against Crown Bridge Partners, LLC ("Crown Bridge"), Soheil Ahdoot ("Soheil"), and Sepas Ahdoot ("Sepas") (Soheil and Sepas are collectively referred to herein as the "Individual Defendants") (Crown Bridge and the Individual Defendants are collectively referred to herein as "Defendants") state as follows:

### NATURE OF THE ACTION

1.      This is a class action against a "death spiral" or "toxic"[1] lender (Crown Bridge) that is controlled and manipulated by the Individual Defendants to carry out a fraudulent scheme to collect upon unlawful debts and otherwise unlawfully obtain repayment of unlawful loans from Plaintiffs and other class members through the use of their criminally usurious convertible

---

[1] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (accessed on August 9, 2022).

promissory notes in violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"). While Defendants' convertible notes reference an interest rate, the purported form of the transaction is merely a sham to evade New York's usury laws. Defendants' convertible notes surreptitiously allow them to convert any or all of the loans' outstanding balances into shares of Plaintiff's and other class members' stock, at a fixed percentage (floating rate) discount conversion price set significantly lower than their stock's trading price. In reality, Defendants' convertible notes were actually loans; loans with interest rates starting at 118% and reaching as high as 251%, which are rates far greater than the maximum 25% permitted under New York law. Defendants' convertible notes also contained significant hidden fees and prepayment penalties.

2.      On August 2, 2022, the Securities and Exchange Commission ("SEC") filed a civil complaint against Crown Bridge in the United States District Court for the Southern District of New York alleging, inter alia, that Crown Bridge operated as an unregistered securities dealer and failed to comply with the dealer registration requirements set forth in the Securities Exchange Act of 1934 ("Exchange Act"). *See Securities and Exchange Commission v. Crown Bridge Partners, LLC, et al.*, Case No. 1:22-cv-06537 (S.D.N.Y. Aug. 2, 2022). One week later, on August 9, 2022, that court entered final judgment against Defendants Crown Bridge, Soheil, and Sepas requiring them to, inter alia, pay approximately $9,000,000 in disgorgement of illegally collected sales for securities used to repay convertible notes.

3.      Convertible notes with "floating-price convertible options" have recently been scrutinized by New York's highest court. In *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 324 (2021), the New York Court of Appeals responded to two questions certified by the Second Circuit Court of Appeals in a matter concerning a convertible note issued by *Adar Bays* (similar to the convertible notes in this action).

4.      In making its determination, the Court of Appeals acknowledged a long history of lenders—like Defendants—attempting to avoid violations of usury laws by disguising loans in various alternative forms.  *Id*. at 338.  Specifically, with regard to convertible notes, the Court of Appeals indicated that "[i]f misused, the floating-price convertible option may constitute another form of usury cloaked in novel form."  *Id*.

5.      The Court of Appeals in *Adar Bays* answers two certified questions from the United States Court of Appeals for the Second Circuit:

> 1. Whether a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest for the purpose of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law.

> 2. If the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void ab initio pursuant to N.Y. Gen. Oblig. Law § 5-511.

*Id*. at 323-24.

6.      As to the first certified question, the Court of Appeals held that "usury laws are implicated 'when a lender stipulates for a contingent benefit' that, if exercised or triggered, has the potential to cause interest to accrue in amounts greater than the legal limit."  *Id*. at 337 (internal citations omitted).  Moreover, the Court of Appeals specifically held that "the contingent nature of the option's exercise [does not] remove the loan from the scrutiny of the usury law;" therefore, courts must "assess the overall value of the conversion option at the time of the bargain."  *Id*. at 338.

7.      As to the second certified question, the Court of Appeals affirmed that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument."  *Id*. at 333.

8.      As a result of the Court of Appeals' decision, the Second Circuit remanded the case to the district court to determine whether the note was usurious and, if the district court so determined, find the convertible note void *ab initio*.  *Adar Bays, LLC v. GeneSYS ID, Inc*., No. 18-3023, 2022 U.S. App. LEXIS 6591, at *1 (2d Cir. Mar. 15, 2022).

9.      In this instance, Defendants took advantage of Plaintiffs and other putative Class[2] members by effectively robbing millions of dollars from them in a matter of months.

10.     As a result of Defendants' stock conversion options, hidden fees, prepayment penalties, original issue discounts and other one-sided provisions in their convertible notes, Defendants were able to disguise the usurious interest rates of the convertible notes, at rates not lower than 118% annual interest and sometimes reaching as high as 251% interest, *i.e.*, *interest rates that egregiously exceeded the maximum enforceable interest rate permitted under New York law*.

11.     Plaintiffs and putative Class members now bring this action to recover all damages incurred from Defendants' usurious convertible notes, and to permanently enjoin Defendants from exercising their myriad unlawful practices.

## THE PARTIES

12.     Plaintiff DarkPulse is a corporation duly organized under the laws of the state of Delaware, with its principal place of business and headquarters located in Texas.

13.     Plaintiff Social Life is a corporation duly organized under the laws of the state of Nevada, with its principal place of business and headquarters located in Colorado.

14.     Plaintiff RedHawk is a corporation duly organized under the laws of the state of Nevada, with its principal place of business and headquarters located in Louisiana.

---

[2] The "Class" is defined in ¶ 53, *infra*.

15.     Defendant Crown Bridge is a limited liability company duly organized under the laws of the state of New York, with its principal place of business and headquarters located in New York.

16.     Defendant Soheil Ahdoot is a principal owner and member of Crown Bridge, and a citizen and resident of New York.

17.     Defendant Sepas Ahdoot is a principal owner and member of Crown Bridge, and a citizen of New York.

## JURISDICTION

18.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself to the laws of the State of New York for the specific transactions at issue.  According to the SEC, Defendants transactions, acts, practices, and courses of business related to the alleged conduct herein occurred largely within the State of New York.

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, and (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO").

21.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(1) because Crown Bridge resides in this District, and each of the Defendants reside in the state of New York.  Venue is also proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

## COMMON FACTUAL ALLEGATIONS

22.     The convertible note lending industry gained popularity because it provides returns that are unmatched.  Convertible note lenders—like Crown Bridge—buy and sell billions of newly-issued shares of microcap securities (*i.e.*, penny stocks), generating millions of dollars in profit.  However, convertible note lenders—like Crown Bridge—generally fail to comply with mandatory dealer registration requirements set forth under federal securities laws.  *See Securities and Exchange Commission v. Crown Bridge Partners, LLC, et al*., Case No. 1:22-cv-06537 (JPC).

23.     On information and belief, Crown Bridge, through the Individual Defendants, operates solely out of the State of New York.  The homepage of Crown Bridge's website is a picture of the New York City skyline.[3]

24.     At all relevant times, Crown Bridge's business model has been to buy convertible notes from microcap securities issuers, convert those notes into newly-issued shares of stock, and quickly sell those shares into the public market at a substantial profit.  From January 2016 to December 2020 Crown Bridge purchased approximately 250 convertible notes from approximately 150 microcap securities issuers.

25.     Upon information and belief, Defendants Soheil and Sepas each owned 50% of Crown Bridge and were its only employees throughout the relevant period. Together, they managed the day-to-day operations of Crown Bridge and had complete authority over Crown Bridge's convertible notes business.

26.     Upon information and belief, the Individual Defendants sourced convertible note opportunities for Crown Bridge through multiple channels.  Defendants held themselves out to the public as being willing to buy convertible notes as a regular business, and they would cold call

---

[3] *See* www.crownbridgepartners.com (last accessed September 20, 2022).

issuers directly.  Over time, as Crown Bridge grew its business and became known in the industry, issuers, brokers, and finders reached out directly to the Individual Defendants to seek funding.

27.     The Individual Defendants negotiated the terms of the Stock Purchase Agreements ("SPAs"), through which Crown Bridge purchased convertible notes directly from penny stock issuers, thereby funding the issuers.  They also negotiated the terms of the convertible notes. Typically, the convertible notes contained terms that were highly favorable to Crown Bridge and reduced Crown Bridge's exposure to market risk, including, but not limited to: (a) a conversion discount ranging from 25% to 50% of the prevailing "market price";[4] (b) the right to obtain additional discounts under certain circumstances; (c) significant prepayment penalties that discouraged issuers from prepaying the convertible notes within the first 180 days, and that included an outright prohibition against prepayments after 180 days; and (d) the right to convert the convertible notes in increments, enabling Crown Bridge to convert what it could sell immediately, while shielding the remaining balance from exposure to market price movements. In certain convertible note transactions, the Individual Defendants arranged for Crown Bridge to receive warrants as an incentive to fund multiple tranches of a particular convertible note, which in turn was additional consideration provided by the issuer in exchange for the note; *i.e.*, additional interest.

28.     The Individual Defendants executed all documents necessary for Crown Bridge to (a) enter into the SPAs, (b) acquire the convertible notes, (c) fund the convertible notes, (c) convert the convertible notes, (d) exercise the warrants, (e) deposit the shares into Crown Bridge's brokerage accounts, and (f) sell the shares into the public markets.

29.     Like many predatory lending companies, Defendants prey upon cash-strapped

---

[4]  Crown Bridge's convertible notes typically define "market price" as the lowest trading price, or lowest closing bid price, of the issuer's common stock during the 10 to 25 days on or before the date of the conversion notice.

businesses that cannot readily obtain financing from banks and other traditional lenders. Although Crown Bridge's convertible notes are titled "Convertible Promissory Note," the purported form of the transaction was merely a sham to evade applicable usury laws. Defendants underwrite, market and collect upon their transactions as loans, with effective interest rates far above those permissible under New York law.

30.     Moreover, Defendants did not even advance the full amount of the purchase prices of the Convertible notes, which was reduced by the Defendants due to certain fees. These fees include underwriting fees, origination fees, wire fees, and processing fees. Despite charging these fees, Defendants performed little or no due diligence, and the actual processing costs were a fraction of the fees. In reality, these fees were merely disguised as additional interest.

31.     In order to evade state usury laws, Defendants include a floating price convertible option that permit them to convert any or all of the outstanding balance of the loan into shares of stock at a conversion price set at 25% to 50% of the stock's lowest trading price for the 10 to 25 prior trading days.

32.     New York law looks primarily to the intent of the parties in determining whether a transaction is a loan. Here, usurious intent can be discerned from Defendants' internal negotiations, underwriting practices and the number of transactions with substantially the same terms. Defendants had the unilateral ability to convert the loan into stock at a fixed discount. Defendants will always be able to receive more on each dollar it converts into stock because the discount has been reserved explicitly in the convertible note at the time the loan was entered into.

33.     The value of the shares converted by Defendants, reserved to defendants at the time of the loans, is interest under New York law and violates the New York's Criminal Usury Laws.

## THE SEC ACTION AGAINST CROWN BRIDGE AND THE INDIVIDUAL DEFENDANTS

34.     On August 2, 2022, the Securities and Exchange Commission ("SEC") filed a civil complaint against Crown Bridge in the United States District Court for the Southern District of New York the ("SEC Action").[5]

35.     The SEC Action alleged that between January 1, 2016, through December 31, 2020, Crown Bridge, through the Individual Defendants, working and operating out of the State of New York, purchased approximately 250 convertible notes from approximately 150 different penny stock lenders, resulting in Crown Bridge being issued, and subsequently selling, over 35 billion shares of unrestricted, newly issued shares of common stock.  On behalf of Crown Bridge, the Individual Defendants would source these convertible note opportunities through multiple channels, including by searching SEC filings, press releases, and cold calling issuers directly.

36.     According to the SEC, by Crown Bridge engaging in its convertible note business, it operated as an unregistered securities dealer and failed to comply with the dealer registration requirements set forth in the Securities Exchange Act of 1934 ("Exchange Act").   This allowed Crown Bridge and the Individual Defendants to avoid dealer regulatory requirements.  The SEC Action alleges this conduct violates Section 15(a)(1) [15 U.S.C. § 78o(a)(1)] of the Exchange Act.

37.     The SEC Action also alleged the Individual Defendants had control person liability for violations of the Exchange Act because the Individual Defendants controlled Crown Bridge and were culpable participants in its Exchange Act violations.

38.     On August 9, 2022—one week after the SEC Action was filed—the court entered a final judgment against Defendants Crown Bridge, Soheil, and Sepas, finding them liable to

---

[5] *See Securities and Exchange Commission v. Crown Bridge Partners, LLC, et al.*, Case No. 1:22-cv-06537 (S.D.N.Y. Aug. 2, 2022) (ECF 1).

disgorge approximately $8.39 million in net profits (plus prejudgment interest) gained as a result of the above-mentioned wrongdoing ("Final Judgment"). The court's order also required Defendants to pay a $810,307 civil penalty.[6]

39.     The SEC Action's Final Judgment also (1) permanently restrained and enjoined Defendants from using any instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security; (2) barred Defendants from participating in or engaging in activities related to a penny stock offering.[7]

### **FACTS SPECIFIC TO PLAINTIFFS**

### A. The DarkPulse Note

40.     DarkPulse entered into a note with Crown Bridge on February 5, 2019 (the "DarkPulse Note"). The DarkPulse Note is attached hereto as **Exhibit A** and is incorporated herein.

41.     The DarkPulse Note should be governed and construed in accordance with the laws of the State of New York. Crown Bridge included a choice of law provision in the DarkPulse Note stating it is to be governed by the laws of the State of Nevada, yet neither Crown Bridge nor DarkPulse have any material business connection to Nevada. On information and belief, Crown Bridge chose Nevada law to govern the DarkPule Note—and almost all other convertible note transactions it enters into—in order to evade New York's usury laws because Nevada is one of the only states that does not have usury laws. Crown Bridge negotiated, drafted, transmitted, paid, and converted the DarkPulse Note from within the boundaries of the State of New York. Accordingly, New York law governs the DarkPulse Note.

---

[6] *Id.*, at ECF 10-12.

[7] *Id.*

42.     Crown Bridge has fully converted out of the DarkPulse Note.

**B. The Social Life Notes**

43.     Over a 1-month period between July and August 2019, Social Life entered into 2 convertible note transactions with Crown Bridge and the Individual Defendants.

44.     The first note was dated July 23, 2019.  The second note was dated August 19, 2019.  These 2 notes (collectively the "Social Life Notes") are attached hereto as **Exhibits B and C**, respectively, and are incorporated herein.

45.     The Social Life Notes should be governed and construed in accordance with the laws of the State of New York.  Crown Bridge included a choice of law provision in the Social Life Notes stating it is to be governed by the laws of the State of Nevada, yet neither Social Life nor Crown Bridge have any material business connection to Nevada.  On information and belief, Crown Bridge chose Nevada law to govern the Social Life Notes—and all other convertible note transactions it enters into—in order to evade New York usury laws because Nevada is one of the only states that does not have usury laws.  Crown Bridge negotiated, drafted, transmitted, paid, and converted the Social Life Notes from within the boundaries of the State of New York.  Accordingly, New York law governs the Social Life Notes.

46.     Crown Bridge has fully converted out of the Social Life Notes.

**C. The RedHawk Notes**

47.     On December 13, 2017, RedHawk entered into a convertible note transaction with Crown Bridge and the Individual Defendants (the "RedHawk Note").[8]

48.     RedHawk also issued Crown Bridge a Common Stock Purchase Warrant.  These agreements (collectively the "RedHawk Agreements") are attached hereto as **Exhibits D and E**,

---

[8] The DarkPulse Note, the Social Life Notes, and the RedHawk Note are collectively referred to herein as the "Notes."

respectively, and are incorporated herein.

49.     The RedHawk Note should be governed and construed in accordance with the laws of the State of New York.  Crown Bridge included a choice of law provision in the RedHawk Note stating it is to be governed by the laws of the State of Nevada, yet neither Crown Bridge nor RedHawk have any material business connection to Nevada.  On information and belief, Crown Bridge chose Nevada law to govern the RedHawk Note—and all other convertible note transactions it enters into—in order to evade New York usury laws because Nevada is one of the only states that does not have usury laws.  Crown Bridge negotiated, drafted, transmitted, paid, and converted the RedHawk Note within the boundaries of the State of New York.  Accordingly, New York law governs the RedHawk Note.

50.     Crown Bridge has fully converted out of the RedHawk Note.

## CLASS ALLEGATIONS

51.     Plaintiffs and putative Class members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

52.     Plaintiffs and putative Class members bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

53.     Plaintiffs bring this putative class action individually and on behalf of other similarly situated persons and/or entities defined as follows:

> All persons and/or entities in the United States who, on or after September 23, 2018, paid money and/or conveyed stock to a member of Crown Bridge pursuant to a convertible note agreement with an effective interest rate exceeding twenty-five percent.

(the "Class").

54.     The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries,

parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

55.     **Numerosity**: The exact number of the putative Class is unknown and is unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  On information and belief, there are more than one hundred members of the putative Class, based on publicly available documents.

56.     **Commonality and Predominance**: There are many common questions of law and fact to the claims of Plaintiffs and the other putative Class members, and those questions predominate over any questions that may affect individual members of the putative Class. Common questions of law and fact include, but are not limited to, the following:

     a.   Whether the Notes are usurious;

     b.   Whether the Notes are void;

     c.   Whether Plaintiffs and the putative Class may recover any monies or property collected by Crown Bridge pursuant to convertible notes; and

     d.   Whether Defendants' conduct was willful or knowing.

57.     **Typicality**: Plaintiffs' claims are typical of the claims of other putative Class members. Plaintiffs and putative Class members sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the putative Class.

58.     **Adequate Representation**: Plaintiffs have and will continue to fairly and

adequately represent and protect the interests of the putative Class and have retained competent and experienced counsel in complex litigation, specifically with New York usury laws.[9]  Plaintiffs have no interests antagonistic to those of the putative Class, and Defendants have no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the putative Class, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other putative Class members.

59.    **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The individual injuries suffered by the putative Class members are likely to be relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' wrongdoing.  Absent a class action, it would be difficult, if not impossible, for the individual putative Class members to obtain effective relief from Defendants.  Even if the putative Class members could individually sustain such litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court, and would require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be

---

[9] Plaintiffs' counsel has successfully litigated myriad cases involving New York usury laws.  Notably, in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021), the New York Court of Appeals adopted Plaintiffs counsel's arguments and ruled in its favor on both certified questions: (1) whether a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest for the purpose of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law; and (2) whether the contract is void ab initio pursuant to N.Y. Gen. Oblig. Law § 5-511 if the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40.  Since the New York Court of Appeals' ruling in *Adar Bays*, numerous federal and state courts have reversed and/or vacated prior decisions in favor of convertible note lenders that were previously awarded summary judgment in their favor.  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 28 F.4th 379 (2d Cir. 2022) (vacating and remanding); *LG Capital Funding, LLC v. Cardinal Energy Grp., LLC*, 2022 U.S. App. LEXIS 11402 (2d Cir April 2022) (same).

ensured.

## COUNT I
### (RICO 18 U.S.C. 1962)

60.     Plaintiffs and putative Class members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

61.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

62.     The imposition of an interest rate in excess of 25% violates New York's usury statutes: New York Penal Law § 190.40 and N.Y. Gen. Oblig. Law §§ 5-501, 511.

63.     The Individual Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c), in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

64.     At all relevant times, the Individual Defendants were, and are, persons that exist separate and distinct from Crown Bridge.

65.     The Individual Defendants have an ownership interest in, and are the masterminds of, Crown Bridge.

66.     Through the Individual Defendants' operation of Crown Bridge, Crown Bridge solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

67.     Crown Bridge is an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

68.     The Individual Defendants and Crown Bridge are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, Crown Bridge has a common goal of soliciting, funding, servicing and collecting

upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

69.     Since at least 2015 and continuing through at least 2021, the Individual Defendants have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by Crown Bridge to small businesses throughout the United States.

70.     The debt, including such debt evidenced by the Notes, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6), because (i) it violates applicable criminal usury statutes, and (ii) the rates are more than twice the legal rate permitted.[10] Under New York law, agreements that are usurious are void and unenforceable.

71.     The Notes (attached and incorporated as **Exhibits A – E**) have minimum effective annual interest rates ranging between 51% to 75%, notwithstanding any additional interest that was charged and/or disguised as original issue discounts, fees, and/or penalties.  A simple summary explaining the formulas used to calculate the minimum effective annual interest rates based on the conversion discounts in the Notes is attached hereto as **Exhibit F** and incorporated herein.

72.     Since at least 2015 and continuing through at least 2021, the Individual Defendants have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreements relating to, and for the purpose of, collecting upon fraudulent fees through electronic wires.

73.     Defendants' conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Defendants' repeated and

---

[10] New York Penal Law §190.40.

continuous conduct constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

74.     The Individual Defendants are the owners and masterminds of Crown Bridge.  They are responsible for its day-to-day operations and have final say on all its business decisions including, without limitation, which usurious loans Crown Bridge will fund; how such loans will be funded; which of Crown Bridge's investors will fund each loan; the payment terms, amount, and period of each usurious loan.

75.     In the Individual Defendants' capacity as the masterminds of the Crown Bridge enterprise, the Individual Defendants are responsible for creating, approving and implementing Crown Bridge's policies, practices and instrumentalities to accomplish its common goals and purposes, including the form of convertible notes used by Crown Bridge, and the conversion discounts Crown Bridge uses to disguise the excess interest being charged against issuers so that it can avoid applicable usury laws and conceal Crown Bridge's collection of unlawful debt.

76.     The Individual Defendants have also taken actions and directed agents of Crown Bridge to take actions necessary to accomplish its overall goals and purposes, including directing Crown Bridge's affairs, funding Crown Bridge, and directing Crown Bridge to collect upon unlawful loans and execute legal documents.

77.     The Individual Defendants have benefited from Crown Bridge's funneling of usurious loan proceeds to Crown Bridge, and the Individual Defendants further benefit from the receipt of distributions and payment of salary, commissions or other distributions by Crown Bridge.

78.     The Individual Defendants have operated Crown Bridge as a part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.  Pursuant to its enterprise engaging in unlawful debt collection, Crown Bridge has: (i) entered into contracts with brokers to solicit

borrowers for usurious loans; (ii) aggregated resources to fund each usurious loan; (iii) underwrote usurious loans and determined the usurious interest rate to be charged under each loan; (iv) entered into the so-called convertible notes on behalf of the Crown Bridge; (v) serviced the usurious loans; and (vi) obtained judgments in Crown Bridge's name to further collect upon the unlawful debt.

79.     Crown Bridge is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

80.     Specifically, Crown Bridge uses the personnel in its office to originate, underwrite, fund, service and collect upon the usurious loans made by Crown Bridge to entities throughout the United States via extensive use of interstate emails, mail, wire transfers, stock conversions and stock sales that are processed through a broker.

81.     The Plaintiffs and putative Class members have and will continue to be injured in their business and property due to Crown Bridge's violations of 18 U.S.C. § 1962(c).

82.     The reasonably foreseeable injuries to the Plaintiffs and putative Class members that were directly and proximately caused by Defendants violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected criminally usurious loan payments.

83.     Plaintiffs and putative Class members have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

84.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff and putative Class members are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## COUNT II
### (Conspiracy under 18 U.S.C. 1962(d))

85.     Plaintiffs and putative Class members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

86.     Defendants have unlawfully, knowingly, and willfully, combined, conspired,

confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described herein, in violation of 18 U.S.C. § 1962(d).

87.     By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of Crown Bridge, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Notes, the Individual Defendants knew the nature of Crown Bridge and knew that Crown Bridge extended beyond each Individual Defendants' role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

88.     The Individual Defendants agreed to facilitate, conduct, and participate in the conduct, management, and operation of Crown Bridge's affairs in order to collect upon unlawful debts, including the Notes, in violation of 18 U.S.C. § 1962(c).  In particular, the Individual Defendants were knowing, willing, and active participants in Crown Bridge and its affairs, and the Individual Defendants shared a common purpose; namely, the orchestration, planning, preparation, and execution of Crown Bridge's scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Notes.

89.     The Individual Defendants agreed to facilitate, conduct, and participate in the conduct, management, and operation of Crown Bridge's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

90.     The participation and agreement of each Individual Defendant was necessary to allow the commission of Crown Bridge's scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Notes.

91.     The injuries to the Plaintiffs and putative Class members directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the loss of millions of dollars due to Crown Bridge's collection of loan payments on usurious loans.

92.     Plaintiffs and putative Class members have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

93.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and putative Class members are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and putative Class members demand judgment in their favor against Defendants, jointly and severally, and seek an Order from the Court:

a)     Certifying this case as a class action on behalf of the putative Class defined above, appointing Plaintiffs as Class representative and appointing their attorneys as class counsel;

b)     Declaring that the Notes entered into between Plaintiffs and the putative Class members and Defendants charged more than double the maximum rate of annualized interest permitted under New York law, and are void *ab initio*;

c)     Ordering Defendants to repay all principal and interest previously collected by Defendants in connection with the criminally usurious loans, including prejudgment interest;

d)     Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

e)     Awarding the Plaintiffs and putative Class members direct and consequential damages;

f)     Awarding Plaintiffs and putative Class members treble damages;

g)     Awarding Plaintiffs and putative Class members their attorneys' fees and costs incurred in this Action;

h)     Granting such other and further relief as this Court deems just and proper.

DATED:          September 23, 2022

                                              **THE BASILE LAW FIRM P.C.**

                                              Respectfully Submitted,

                                              */s/ Gustave Passanante*
                                              Gustave P. Passanante, Esq.
                                              390 N. Broadway, Suite 140
                                              Jericho, New York 11753
                                              Tel.:     (516) 455-1500
                                              Fax:      (631) 498-0748
                                              Email:   gus@thebasilelawfirm.com

                                              *Attorneys for Plaintiffs*