USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/12/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARKPULSE, INC.; SOCIAL LIFE NETWORK, INC.; and REDHAWK HOLDINGS CORP., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> - against - <br><br> CROWN BRIDGE PARTNERS, LLC, SOHEIL AHDOOT, and SEPAS AHDOOT, <br><br> Defendants. | **22 Civ. 8163 (VM)** <br><br> <u>**DECISION AND ORDER**</u> |

**VICTOR MARRERO, United States District Judge.**

Plaintiffs DarkPulse, Inc. ("DarkPulse"), Social Life Network, Inc. ("Social Life"), and RedHawk Holdings Corp. ("RedHawk," and collectively with DarkPulse and Social Life, "Plaintiffs") brought this action against Defendants Crown Bridge Partners, LLC ("Crown Bridge"), Soheil Ahdoot ("Soheil"), and Sepas Ahdoot ("Sepas," and with Soheil, the "Individual Defendants," and collectively with Crown Bridge, "Defendants"). Plaintiffs allege violations of 18 U.S.C. §§ 1962(c) and (d) based on Defendants' collection of allegedly unlawful debts.[1] Now pending before the Court is Defendants'

---

[1] The Complaint also alleges that Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) by committing wire fraud in violation of 18 U.S.C. § 1343. Plaintiffs agreed to the dismissal of those claims and to the dismissal of their class allegations. (<u>See</u> Dkt. No. 57 at 3 n.1.)

1

motion for summary judgment[2] and Plaintiffs' motion for partial summary judgment on the issue of choice-of-law. (See "Defendants' Motion" or "Defs. Mot.," Dkt. No. 83; "Plaintiffs' Motion" or "Pls. Mot.," Dkt. No. 87.) For the reasons stated below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** and Plaintiffs' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

A. FACTUAL HISTORY

Crown Bridge is a limited liability company based in, and organized under the laws of, New York. (See "Defs. SOMF," Dkt. No. 86 ¶ 4; "Pls. SOMF," Dkt. No. 89 ¶ 71.) Soheil and Sepas are the principal owners and members of Crown Bridge as well as its sole employees. (See Defs. SOMF ¶ 5; Pls. SOMF ¶¶ 72-73.) Crown Bridge's business model is to purchase convertible notes[3] from microcap securities issuers, convert those notes into newly-issued shares of stock, and then sell

---

[2] Defendants styled their motion as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). The Court construes Defendants' motion as a motion for summary judgment pursuant to Rule 56.

[3] A convertible note is a type of debt security that gives the lender the right to take repayment of a loan either in cash or in newly-issued company stock. Like an option or warrant, the lender is given the right to purchase company stock at a particular strike price; at conversion, the lender "converts" the note, i.e., it uses the accrued debt to "purchase" the stock instead of receiving cash.

those shares on the public market. (See "Complaint" or "Compl.," Dkt. No. 1 ¶ 24.)

DarkPulse is a corporation organized under the laws of Delaware. (Defs. SOMF ¶ 1; Pls. SOMF ¶ 44.) While the parties dispute whether DarkPulse's current principal place of business is in New York, DarkPulse's principal place of business and headquarters was in New York when it entered into a convertible note with Crown Bridge on February 19, 2019. (See "DarkPulse Note," Dkt. No. 1-1, Ex. A at 1, 14.)[4] The DarkPulse Note included a New York forum-selection clause and a Nevada choice-of-law clause. (See id. at 15, ¶ 4.6.) At the time the Complaint was filed, Crown Bridge had fully converted out of the DarkPulse Note.

Social Life is a corporation organized under the laws of Nevada with its principal place of business and headquarters in Colorado. (See Defs. SOMF ¶ 2; Pls. SOMF ¶ 27.) Social Life entered into two convertible note transactions with Crown Bridge, first on July 23, 2019 ("July

---

[4] The Complaint filed on September 23, 2022, listed DarkPulse's principal place of business as Texas. (See Compl. ¶ 12.) While Plaintiffs later stated that this was accurate at the time they filed the Complaint, in subsequent filings, Plaintiffs have clarified that from November 2018 to May 2022, DarkPulse was located in New York and from May 2022 until December 2024, DarkPulse's principal place of business was moved to Houston, Texas. (Pls. SOMF ¶¶ 53-54.) However, following DarkPulse's insolvency, the company moved back to New York in December 2024. (Id. ¶¶ 55-58.)

Social Life Note," Dkt. No. 1-2)[5], and second on August 19, 2019 ("August Social Life Note," Dkt. No. 1-3, and together with the July Social Life Note, the "Social Life Notes"). Like the DarkPulse Note, the Social Life Notes contained a New York forum-selection clause and a Nevada choice-of-law clause. (See July Social Life Note at 17, ¶ 4.7; August Social Life Note at 16, ¶ 4.7.) Crown Bridge has fully converted out of the Social Life Notes.

RedHawk is a corporation organized under the laws of Nevada with its principal place of business and headquarters in Louisiana. (See Defs. SOMF ¶ 3; Pls. SOMF ¶¶ 1-2.) On December 13, 2017, RedHawk entered into a convertible note transaction with Crown Bridge. (See "RedHawk Note," collectively with the DarkPulse Note and the Social Life Note, the "Notes," Dkt. No. 1-4, Ex. D.) RedHawk also issued Crown Bridge a common stock purchase warrant, with an issuance date of February 21, 2018. (See "RedHawk Warrant," Dkt. No. 1-5, Ex. E.) The RedHawk Note contained a New York forum-selection clause and a Nevada choice-of-law clause. (RedHawk Note at 15, ¶ 4.6.) The RedHawk Warrant contained a

---

[5] While the Complaint lists two convertible note transactions, Plaintiffs state that "subsequent evidence indicates there was only one loan, dated August 19, 2019." ("Pls. Counter SOMF," Dkt. No. 96 ¶ 6.) Since, as explained further below, the Court will uphold the Nevada choice-of-law clauses present in both Social Life Notes, the issue of whether there is one or two notes is moot.

4

Nevada choice-of-law clause. (RedHawk Warrant at 6, ¶ 10.) Crown Bridge has fully converted out of the RedHawk Note.

The Notes each contained terms that imposed minimum effective annual interest rates ranging between fifty-one and seventy-five percent, without accounting for additional interest charged and or disguised as discounts, fees, or penalties. (See Dkt. No. 1-6, Ex. F.)

B. PROCEDURAL HISTORY

On September 23, 2022, Plaintiffs filed their Complaint. (See Dkt. No. 1.) Following an exchange of pre-motion letters, on January 13, 2023, Defendants filed their motion to dismiss. (See Dkt. No. 23.) Following a decision denying Plaintiffs' request for leave to amend the Complaint (see Dkt. No. 31), the Plaintiffs filed a memorandum of law in opposition to the motion to dismiss. (See Dkt. No. 32.) Defendants subsequently filed a reply memorandum of law in support of their motion to dismiss. (See Dkt. No. 35.)

On September 29, 2023, the Court issued a Decision and Order (the "Decision and Order") granting Defendants' motion to dismiss. (See Dkt. No. 36.) Specifically, this Court found that because the promissory notes at issue contained a Nevada choice-of-law clause and Nevada does not have criminal usury laws, the Complaint failed to sufficiently allege that Defendants violated 18 U.S.C. §§ 1962(c) and (d). (See id.)

5

In conducting the choice-of-law analysis, the Court relied in part on the reasoning found in DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC, ("FirstFire") No. 21-CV-11222, 2023 WL 199196 (S.D.N.Y. Jan. 17, 2023), aff'd in part, vacated in part, remanded, No. 23-78, 2024 WL 1326964 (2d Cir. Mar. 28, 2024) (Summary Order). Plaintiffs appealed the Decision and Order to the United States Court of Appeals for the Second Circuit. (See Dkt. No. 41.)

On August 19, 2024, the Second Circuit issued a Summary Order vacating the Decision and Order and remanding the matter for further consideration. (See Dkt. No. 57.) Specifically, the Second Circuit found that this Court erred in relying on the choice-of-law analysis set forth in FirstFire, rather than conducting an independent analysis based on the facts alleged in this case. (See id. at 6-7.) The Second Circuit remanded this matter for jurisdictional discovery. (See id. at 8.)

Following discovery, on May 27, 2025, Defendants filed a motion for summary judgment (Dkt. No. 83) along with a supporting declaration and exhibits (Dkt. No. 84), a supporting memorandum of law (Dkt. No. 85), and a statement of material facts (Dkt. No. 86). That same day, Plaintiffs filed a motion for partial summary judgment on the choice-of-law issue (Dkt. No. 87) accompanied by a supporting

6

memorandum of law (Dkt. No. 88), a statement of material facts (Dkt. No. 89), and a declaration with supporting exhibits (Dkt. No. 90). On June 17, 2025, Defendants filed a memorandum of law in opposition to Plaintiffs' motion for partial summary judgment (Dkt. No. 97) accompanied by a declaration with supporting exhibits (Dkt. No. 98) and a counter statement to Plaintiffs' statement of material facts (Dkt. No. 99). That same day, Plaintiffs filed a memorandum of law in opposition to Defendants' motion for summary judgment (Dkt. No. 95) and a counter statement to Defendants' statement of material facts (Dkt. No. 96). On July 16, 2025, Plaintiffs filed a reply in support of their motion for partial summary judgment (Dkt. No. 102) accompanied by a declaration with supporting exhibits (Dkt. No. 103). That same day, Defendants filed a reply in support of their motion for summary judgment (Dkt. No. 104).

## II.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 ("Rule 56") provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the district court "must construe the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (quoting Lucente v. County of Suffolk, 980 F.3d 284, 296 (2d Cir. 2020)). "When a court must decide cross-motions for summary judgment, it must analyze each party's motion 'on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" Phillies v. Harrison/Erickson, No. 19-CV-7239, 2021 WL 5936523, at *9 (S.D.N.Y. Aug. 10, 2021) (quoting Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact[.]" New York v. Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2019) (quoting Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166 (2d Cir. 2016)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 259 (2d Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247–48. In turn, a party

opposing summary judgment "must provide more than conclusory allegations," Gorzynski v. JetBlue Airways, Corp., 596 F.3d 93, 101 (2d Cir. 2010), and must support its position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A) and (B).

However, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage[.]" Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kee, 12 F.4th at 166-67 (quoting Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010)). Thus, summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. See id. at 158.

### III.  DISCUSSION

Plaintiffs' Complaint asserts two counts, one for violation of 18 U.S.C. § 1962(c) ("Section 1962(c)") through the collection of an unlawful debt and another for conspiracy to collect an unlawful debt in violation of 18 U.S.C. §

9

1962(d). To state a claim under Section 1962(c) based on the collection of an unlawful debt, the plaintiff must allege that "the debt was unenforceable in whole or in part because of state or federal laws relating to usury." Dae Hyuk Kwon v. Santander Consumer USA, 742 F. App'x 537, 539 (2d Cir. 2018) (quotation marks omitted). Since usury is not unlawful under Nevada law, the Plaintiffs ask the Court to disregard the Nevada choice-of-law clauses in the Notes and instead apply New York law, which criminalizes usury. Here, the Court will apply Nevada law for the RedHawk Note and the Social Life Notes because the parties and transactions bear a reasonable relationship to Nevada and the application of Nevada usury law to the Plaintiff corporations does not violate the fundamental public policy of New York. However, because as it pertains to the DarkPulse Note no such reasonable relationship exists, the Court will not apply Nevada Law.

A. COUNT ONE: UNLAWFUL DEBT COLLECTION UNDER 18 U.S.C. § 1962(c)

Count One of the Complaint alleges that Defendants violated Section 1962(c) through the collection of an unlawful debt. According to the Complaint, the Notes constitute "unlawful debt" as defined by 18 U.S.C. § 1961(6) because they violated New York's criminal usury laws and

imposed interest rates at least twice the twenty-five percent interest rate allowed by New York.

Section 1962(c) prohibits "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). An "'unlawful debt' means a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Thus, to allege a Section 1962(c) claim for the collection of unlawful debt, "a plaintiff must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) the debt was incurred in connection with the business of lending money at a usurious rate and (3) the usurious rate was at least twice the enforceable rate." Dae Hyuk Kwon, 742 Fed. App'x at 539 (alterations and quotation marks omitted).

Here the viability of Plaintiffs' claim comes down to the Court's choice-of-law analysis. For Plaintiffs' claim to

succeed, the Court would need to disregard the Nevada choice-of-law clauses as provided for in the Notes (see DarkPulse Note at 15, ¶ 4.6; July Social Life Note at 17, ¶ 4.7; August Social Life Note at 16, ¶ 4.7; RedHawk Note at 15, ¶ 4.6) and find instead that New York law governs. Defendants ask the Court to enforce the Nevada choice-of-law clauses and apply Nevada law, which does not criminalize usury. See NRS 99.050. Plaintiffs ask the Court to disregard the choice-of-law clauses and instead apply New York law, which criminalizes usury. See N.Y. Penal Law § 190.40. "Because there is a conflict [of law], the Court must determine whether the choice-of-law provision is unenforceable under New York law."[6] Medtronic, Inc. v. Walland, No. 21-CV-2908, 2021 WL 4131657, at *6 (S.D.N.Y. Sept. 10, 2021).

a. Choice of Law Analysis

"The general rule under New York law . . . is that 'courts will generally enforce choice-of-law clauses and that

_____

[6] As the Second Circuit noted, "[j]urisdiction in this case is predicated on a federal question, and therefore the relevant forum is federal district court – where federal common law applies." (Dkt. No. 57 at 4.) However, in its Summary Order, the Second Circuit applied the substantive law of New York, because this Court previously applied such law and the parties did not object. (See id.) The Second Circuit also noted that any difference between applying federal common law and New York law was likely academic because, "applying federal common law would likely lead to the same result as applying New York law." Id. at 4 n.2 (quoting Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 81 (2d Cir. 2007)). Therefore, given the Second Circuit's application of New York substantive law to the choice-of-law analysis, the lack of any objections by the parties who applied New York law in their respective motions for summary judgment and partial summary judgment, and the significant

12

contracts should be interpreted so as to effectuate the parties' intent.'" Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A., 51 F.4th 456, 472 (2d Cir. 2022) (quoting Ministers & Missionaries Ben. Bd. v. Snow, 26 N.Y.3d 466, 470 (2015)); see also United States v. Moseley, 980 F.3d 9, 20 (2d Cir. 2020) ("Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." (citation omitted)); Welsbach Elec. Corp. v. MasTec N. Am., Inc., 859 N.E.2d 498, 500 (N.Y. 2006) ("Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction."). "Courts may refuse to enforce a choice-of-law clause only where (1) the parties' choice has no reasonable basis or (2) application of the chosen law would violate a fundamental public policy of another jurisdiction with materially greater interests in the dispute." Reiff v. CyberRisk All., LLC, No. 25-CV-6351, 2025 WL 3019938, *2 (S.D.N.Y. Oct. 29, 2025) (alteration and citation omitted).

Here, the Court will conduct an independent analysis to determine whether sufficient contacts exist between the

---

overlap between federal common law and New York law, the Court will apply New York substantive law.

parties or the transaction and Nevada such that applying the Nevada choice-of-law clauses is reasonable. The Court will then examine whether the application of Nevada law regarding usury violates the fundamental public policy of New York.

### i. Reasonable Relationship

While the state chosen in a contract's choice-of-law clause "need not have the *most* significant contacts to the dispute for a court to apply that state's law . . . a court must still independently determine [that] there are sufficient contacts with the contractually selected state to enforce a choice-of-law clause." (Dkt. No. 57 at 5 (citations omitted).) The "relevant inquiry is not . . . whether the selected state is the state with the greatest number of connections to the parties or the transaction; rather, it is whether the relationship to the selected state is 'reasonable.'" Frommer v. MoneyLion Techs. Inc., No. 23-CV-6339, 2025 WL 2751254, at *25 (S.D.N.Y. Sept. 29, 2025) (quoting EMA Fin., LLC v. NFusz, Inc., 444 F. Supp. 3d 530, 541 (S.D.N.Y. 2020)).

To determine whether sufficient contacts with the contractually selected state exist such that there is a reasonable relationship with the parties or the transaction, New York "courts have looked to the location of the following factors: the parties' negotiation of the agreement;

performance under the agreement, including where loan payments were received; the parties' places of incorporation; the parties' principal places of business; and the property that is the subject of the transaction." Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017). While these factors largely mirror the factors listed in the Restatement (Second) of Conflicts of Laws § 188, courts are not constrained to consider only these factors in determining whether a reasonable relationship does exist. See FirstFire, 2023 WL 199196, at *12 (finding the Nevada choice-of-law clause was reasonably related to the parties or transaction in part because the company DarkPulse "entered into at least three other agreements with a Nevada choice-of-law clause"); Frommer, 2025 WL 2751254, at *25 (finding the state selected in the contract's choice-of-law clause was reasonable in part because the parties entered into other agreements with similar choice-of-law clauses and the contract referred to the law of the state in the choice-of-law clause for its terms and definitions).

Under New York law, only when it has been determined that "a choice of law clause is not dispositive" will courts apply "the 'center of gravity' or 'grouping of contacts' choice of law theory." Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 822 F.3d 620, 641 (2d Cir. 2016) (citation,

15

quotation marks, and alteration omitted). "Under this approach, the courts ... lay emphasis ... upon the law of the place which has the most significant contacts with the matter in dispute." Moseley, 980 F.3d at 23 (internal quotation marks omitted). In determining which place has the most significant contacts, courts in New York consider "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." Fireman Funds, 822 F3d at 642.

### 1. There is a Reasonable Relationship Between Social Life and Nevada

There is no dispute that Social Life is a Nevada corporation. (See Defs. SOMF ¶ 2; Pls. SOMF ¶ 27.) Social Life became a publicly traded Nevada corporation in 2016 by effecting a reverse merger with a public shell company called Sew Cal Logo, Inc., a Nevada-registered company in receivership. (See Pls. SOMF ¶ 31.) According to Social Life's CEO Ken Tapp ("Tapp"), Social Life never considered changing Nevada as its place of incorporation because of Nevada's favorable business environment compared to that of other states. (See "Tapp Tr.," Dkt. No. 90-2, Ex. 2 at 19:14-18 ("Given that Nevada, Delaware and a few other states are pretty friendly states to be incorporated for public companies, we just didn't think twice to move it to say

16

Colorado or some other state that's not as friendly as a public company.") and at 74:10-13 ("So as far as I'm concerned, the state of Nevada is A-okay.").) Therefore, while Social Life may not have initially chosen to incorporate in Nevada, it decided not to reincorporate elsewhere because of Nevada's more favorable business environment.

As a matter of law, Social Life's incorporation in Nevada alone is sufficient to establish a reasonable relationship between Social Life and Nevada. While "[c]ourts are divided as to whether the state of incorporation of one of two parties to a contract, alone, is sufficient to create a reasonable relationship, [] this Court is persuaded to follow precedent finding that fact alone dispositive." Reiff, 2025 WL 3019938, at *3. "Most courts deem[] one party's incorporation in the state of the parties chosen law sufficient for purposes of the 'reasonable relationship' test." Frommer, 2025 WL 2751254, at *25 (quoting Willis Re Inc. v. Herriott, 550 F. Supp. 3d 68, 95 (S.D.N.Y. 2021)) (alteration omitted). In EMA Financial, "the Court regard[ed] with some skepticism the arguments made by a Nevada

17

corporation that the laws of its state of incorporation should not apply." 444 F. Supp. 3d 530, 541 (S.D.N.Y. 2020).

The Court here is likewise skeptical of the arguments made by Social Life, a Nevada corporation, that the laws of its state of incorporation should not apply. Though Social Life may not have initially chosen Nevada as its place of incorporation, it has never sought to change its incorporation because of Nevada's favorable business environment.

Plaintiffs argue that the place of contracting, place of negotiation, place of performance, and the incorporation of Crown Bridge in New York all support a finding that New York law should apply. (See "Pls. Mem. of Law," Dkt. No. 88, at 8-12.) However, as the Second Circuit noted in its summary order, "the state chosen by contract need not have the *most* significant contacts to the dispute for a court to apply that state's law." (Dkt. No. 57 at 5; see also EMA Fin., 444 F. Supp. 3d at 541 ("The relevant inquiry is not, however, whether the selected state is the state with the greatest number of connections to the parties or the transaction; rather, it is whether the relationship to the selected state is 'reasonable.'").) Because Social Life's incorporation in Nevada is sufficient to establish a reasonable relationship,

whether New York has "the *most* significant contacts to the dispute" is irrelevant. (Dkt. No. 57 at 5.)

 2. There is a Reasonable Relationship Between RedHawk and Nevada

There is also no dispute that RedHawk is a Nevada corporation. RedHawk became a Nevada corporation after RedHawk's CEO and Chairman of its Board of Directors Gerard Darcy Klug invested in Nevada corporation Independence Energy and changed that company's name to RedHawk. (See Pls. Counter SOMF ¶ 39.) Following this change, Klug and RedHawk's corporate counsel had brief conversations about incorporating in a different state but chose to keep RedHawk incorporated in Nevada. (See "Klug Tr.," Dkt. No. 90-1, Ex. 1 at 36:16-37:6.) Even if the state of incorporation was initially fortuitous, RedHawk chose to accept Nevada law by keeping its incorporation in that state. While, for the reasons discussed above, RedHawk's incorporation in Nevada alone as a matter of law is sufficient to establish a reasonable relationship between RedHawk and Nevada, there are also additional contacts that make the relationship reasonable.

RedHawk has also entered into other similar securities purchase agreements and convertible notes arrangements with other lenders that contained a Nevada choice-of-law clause.

19

RedHawk has entered into at least half a dozen such agreements and convertible notes with other lenders, including, Armada Capital, Auctus Fund, B.P. Capital NY, Inc., Eagle Equities, LLC, EMA Financial, LLC, and Labrys Fund LP – all of which contained a Nevada choice-of-law clause. (See Pls. Counter SOMF ¶ 40.) The existence of these similar contracts "further demonstrates [RedHawk's] amenability to transacting business" in Nevada. FirstFire, 2023 WL 199196, at *12 (finding the Nevada choice-of-law clause was reasonably related to the parties in part because the company had "entered into at least three other agreements with a Nevada choice-of-law clause").

Plaintiffs again argue that the place of contracting, place of negotiation, place of contract performance, and Crown Bridge's incorporation in New York support a finding that New York law should apply. (See Pls. Mem. of Law at 8-12.) However, for the reasons explained above, because a reasonable relationship exists between RedHawk and Nevada, the choice-of-law clause controls regardless of whether another state has more significant contacts to the dispute.

3. There is Not a Reasonable Relationship Between DarkPulse and Nevada

There are not sufficient contacts between DarkPulse and Nevada to establish a reasonable relationship. Defendants

20

allege that there are multiple connections between DarkPulse and Nevada, such that a reasonable relationship can be established. Specifically, Defendants claim that DarkPulse has a wholly-owned and managed subsidiary in Nevada, DarkPulse signed other agreements with Nevada choice-of-law clauses, and DarkPulse visited Nevada for business related purposes twice. (See Defs. SOMF ¶¶ 55, 74, 75, 77.) The Court does not find these kinds of contacts to be sufficient.

Defendants' argument that there is reasonable relationship between the parties or the transaction and Nevada based on a handful of tenuous connections is unavailing. First, the incorporation of a DarkPulse subsidiary in Nevada years after the DarkPulse Note was executed has little to do with the formation of that note. Further, it is bedrock law that subsidiaries are distinct legal entities from their parent corporation. See In re China Constr. Bank Corp., 803 F. Supp. 3d 260, 278 (S.D.N.Y. 2025) ("[U]nder New York law, a subsidiary is a legally distinct entity from its parent corporation." (alterations and quotation marks omitted)). That DarkPulse's subsidiary is located in Nevada is therefore of little relevance as to whether there is a reasonable relationship between DarkPulse, the DarkPulse Note, and Nevada.

Second, while DarkPulse signed other agreements with Nevada choice-of-law clause, such a contact without more is not sufficient to establish a reasonable relationship. See Frommer, 2025 WL 2751254, at *25 (finding a reasonable relationship where the parties entered into multiple agreements with the same state selected for the choice-of-law clause and the Defendant was incorporated in that state); FirstFire, 2023 WL 199196, at *12 (finding that the Nevada choice-of-law clause was reasonably related to the parties where DarkPulse "entered into at least three other agreements with a Nevada choice-of-law clause" and "the parties met in Nevada to negotiate the Amendment."). Finally, DarkPulse's two visits to Nevada had no connection to the DarkPulse Note and came years after the note's execution. (See Pls. Counter SOMF ¶ 77.) These contacts, even when taken together, as a matter of law, are insufficient to create a reasonable relationship between the parties or the transaction and Nevada.

Without an effective choice-of-law provision, New York courts "look to the center of gravity of a contract to determine choice of law." AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 135 (2d Cir. 2018). "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of

negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Id.

Here there is a dispute as to where the "center of gravity" of the DarkPulse Note is located. While there is no genuine dispute of material fact that both Crown Bridge and DarkPulse had their principal places of business in New York at the time of the DarkPulse Note's execution[7], there is a genuine dispute of material fact about whether DarkPulse's current place of business is still in New York. (See "Defs. Counter SOMF," Dkt. No. 99 ¶ 44.) Further, the parties dispute both the location of the subject matter of the contract and where the performance of the contract was located. (See "Defs. Reply," Dkt. No. 104 at 7-9; Pls. Mem. of Law at 8-12; Defs. Counter SOMF ¶ 84.)

Looking at the other factors, since DarkPulse is a Delaware corporation and Crown Bridge is a New York corporation, this factor supports a connection with either

---

[7] Contemporaneous SEC filings and the DarkPulse Note itself show that from at least November 19, 2018, until May 27, 2022, DarkPulse maintained its principal place of business in New York. (See DarkPulse Note at 14 (listing a New York address for DarkPulse); DarkPulse, Inc., Form 8-K/A (November 19, 2018), available at https://www.sec.gov/Archives/edgar/data/866439/000168316818003493/darkpulse_8ka1.htm (listing a change of address from Virginia to New York); DarkPulse Inc., Form 8-K (May 27, 2022), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000866439/000168316822004060/darkpulse_8k.htm (listing a change of address from New York to Texas).) The Court takes judicial notice of these filings. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

state. (See Defs. Counter SOMF ¶¶ 44, 71). Finally, the place of negotiation is a largely neutral factor here because the negotiations happened over email and phone. (See Defs. Counter SOMF ¶ 69); see Haymount Urgent Care PC v. GoFund Advance, LLC, 690 F. Supp. 3d 167, 176 (S.D.N.Y. 2023) ("The 'place of negotiation' has no strong contact to either forum, since the agreements were negotiated over phone or email.").

Given that DarkPulse's current principal place of business and the location of the subject of the contract are important center of gravity factors, the existence of genuine disputes of material fact for both factors indicates that granting summary judgement on which state's law should govern the DarkPulse Note is inappropriate. See Haymount, 690 F. Supp. 3d at 175 ("[T]he borrower's domicile and the subject matter of the funding agreement deserve particular emphasis." (internal quotation marks omitted)). While the center of gravity test may ultimately find that New York has the greatest contacts, with outstanding disputes of material fact regarding DarkPulse's current principal place of business, the location of the subject matter of the contract, and the place of performance, the Court will decline to grant both Defendants' motion for summary judgement and Plaintiffs'

24

motion for partial summary judgement on the issue of choice-of-law as to DarkPulse.

   ii. Public Policy

Plaintiffs fail to demonstrate that enforcing Nevada law would violate the fundamental public policy of New York. There is "a longstanding public policy in New York in favor of enforcing its usury laws to protect those of its residents who enter into consumer debt contracts." Moseley, 980 F.3d at 22. "In consumer loan contracts, choice-of-law provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy." Id. However, "corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit." Id. Plaintiffs here are "corporations — the antithesis of the type of needy and unsophisticated consumers" for whom New York's public policy against usury counsels providing relief from a choice-of-law clause. Id.

Plaintiffs argue that Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320 (N.Y. 2021), "shows that New York's fundamental public policy against usury should include loans to corporations, not just loans to individual citizens." ("Pls. Reply," Dkt. No. 102 at 7.) In that case, the New York Court of Appeals upheld a defendant-borrower's invocation of

25

New York's usury laws as a defense to protect against the enforcement of a usurious contract. Adar Bays, 37 N.Y.3d at 335. However, by Plaintiffs' own admission, "Adar Bays did not address usury in the choice-of-law context." (Pls. Mem. of Law at 14.) Further, courts in this Circuit since Adar Bays continue to draw a distinction between New York's public policy interest in consumer loans and commercial transactions when deciding whether to provide relief from a choice-of-law clause. See Cyber Apps World, Inc. v. EMA Fin., LLC, 645 F. Supp. 3d 281, 286 (S.D.N.Y. 2022) ("[T]he policy interests underlying New York's usury prohibition do not extend to [corporations]. Corporations are 'the antithesis of the type of needy and unsophisticated consumers' that New York usury laws were designed to protect." (quoting Moseley, 980 F.3d at 22)).

For example, in Axos Bank v. 64-03 Realty LLC, the court applied a Nevada choice-of-law clause in a usury case involving a corporate borrower because "application of New York Law would not serve to promote New York public policy." No. 20-CV-3549, 2024 WL 1435971, at *11 (E.D.N.Y. Apr. 3, 2024). "Instead, [application of New York law] would undermine New York's interest in promoting certainty and predictability in commercial contracting." Id. (quotation marks and citation omitted). Therefore, because the

Plaintiffs here are corporations that entered into commercial transactions with Defendants relating to the underlying contracts, the enforcement of the Nevada choice-of-law clauses does not violate New York's fundamental public policy against usury.

B. COUNT TWO: CONSPIRACY TO COLLECT UNLAWFUL DEBT UNDER 18 U.S.C. § 1962(d)

For the reasons explained above, the Court will **GRANT** Defendant's motion for summary judgement only as to Plaintiff's Social Life and RedHawk but will **DENY** as to DarkPulse.

C. **ORDER**

For the reasons explained above, it is hereby

**ORDERED** that the motion for partial summary judgment on the issue of choice-of-law filed by plaintiffs DarkPulse, Inc. ("DarkPulse"), Social Life Network Inc. ("Social Life"), and RedHawk Holdings Corp. ("RedHawk") (Dkt. No. 87) is **DENIED IN PART** and **GRANTED IN PART**. The Court concludes that granting summary judgment is inappropriate in this litigation insofar as the Court finds that there are genuine issues of material fact as to whether DarkPulse's current place of business is still in New York, as to both the location of the subject matter of the contract, and where the performance of the contract was located. Accordingly, the motion is

27

**DENIED IN PART** as to Social Life and RedHawk, but is **GRANTED IN PART** to DarkPulse to the extent that the Nevada choice-of-law clause does not apply, though the Court declines to determine which state's law should apply under the "center of gravity" test; it is further

**ORDERED** that the motion for summary judgment filed by defendants Crown Bridge Partners LLC, Soheil Ahdoot, and Sepas Ahdoot (Dkt. No. 83) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED IN PART** as to Social Life and RedHawk but is **DENIED IN PART** as to DarkPulse.

**SO ORDERED.**

Dated:    12 March 2026
          New York, New York

_____
          Victor Marrero
          U.S.D.J.